UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WOODROW BARNES,

              Plaintiff,                  CIVIL ACTION NO. 10-12973

        v.                       DISTRICT JUDGE DAVID M. LAWSON

COMMISSIONER OF               MAGISTRATE JUDGE MARK A. RANDON
SOCIAL SECURITY,

              Defendant.

_____/

**REPORT AND RECOMMENDATION
ON PLAINTIFF'S MOTION FOR REMAND AND
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I.   PROCEDURAL HISTORY

### A.   *Proceedings in this Court*

On July 28, 2010, Plaintiff filed the instant suit seeking judicial review of the Commissioner's decision disallowing benefits (Dkt. No. 1). Pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(b)(3), this matter was referred to the undersigned for the purpose of reviewing the Commissioner's decision denying Plaintiff's claim for a period of disability, Disability Insurance, and Supplemental Security Income benefits (Dkt. No. 6). This matter is currently before the Court on Plaintiff's motion for remand (Dkt. No. 12) and Defendant's motion for summary judgment (Dkt. No. 13). Plaintiff also filed a reply brief (Dkt. No. 14).

### B.   *Administrative Proceedings*

Plaintiff filed the instant claims on July 10, 2007, alleging that he became unable to work on April 15, 2004 (Tr. 16, 126-132). The claim was initially disapproved by the Commissioner on September 24, 2007 (Tr. 16, 90-94). Plaintiff requested a hearing and, on July 7, 2009, Plaintiff

-1-

appeared without counsel before Administrative Law Judge (ALJ) Ayrie Moore, who considered the case *de novo*.  In a decision dated October 20, 2009, the ALJ found that Plaintiff was not disabled (Tr. 13-28).  Plaintiff requested a review of this decision on December 7, 2009 (Tr. 11).  The ALJ's decision became the final decision of the Commissioner when the Appeals Council, on July 6, 2010, denied Plaintiff's request for review (Tr. 1-6).

In light of the entire record in this case, I find that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled.  Accordingly, it is **RECOMMENDED** that Plaintiff's motion for remand be **DENIED**, Defendant's motion for summary judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

## II.    STATEMENT OF FACTS

### A.    *ALJ Findings*

Plaintiff was 43 years old on his alleged disability onset date (Tr. 26).  Plaintiff has past relevant work as a "torchman" (Tr. 26).  The ALJ applied the five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff had not engaged in substantial gainful activity since April 15, 2004 (Tr. 18).  At step two, the ALJ found that Plaintiff had the following "severe" impairments: a congenital lumbar spine deformity, asthma, chronic obstructive pulmonary disorder (COPD), depression, borderline intellectual functioning, impulse control disorder, and cocaine abuse in remission.  *Id*.  At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations (Tr. 18-20).

Between steps three and four, the ALJ found that Plaintiff had the Residual Functional Capacity (RFC) to perform "light work...that involves simple, routine, repetitive tasks; no concentrated exposure to pulmonary irritants; no reading or writing; no bending from the waist to the floor; minimal changes in the work routine, work tasks, or work environment; occasional

postural activities, such as climbing, balancing, stooping, kneeling, crouching, and crawling; incidental contact with the public; and occasional contact with co-workers. Additionally [Plaintiff] can be around or work near other co-workers, but cannot work collaboratively with them" (Tr. 20). At step four, the ALJ found that Plaintiff could not perform his previous work as a torchman (Tr. 26). At step five, the ALJ denied Plaintiff benefits, because the ALJ found that Plaintiff could perform a significant number of jobs available in the national economy, such as food preparation worker (30,000 jobs in Michigan), housekeeper (20,000 jobs in Michigan) or assembler (20,000 jobs in Michigan) (Tr. 27).

### B.   *Administrative Record*

#### 1.   **Plaintiff's Testimony and Statements**

Plaintiff appeared at the hearing with his social worker, Beth Keenan, but without an attorney and waived his right to counsel (Tr. 33-35). Plaintiff testified that he was first imprisoned in 1999 for home invasion and was returned to prison in 2007 or 2008 due to a parole violation following a charge of domestic violence (Tr. 35-36). Plaintiff stated that he could not read or write and completed only tenth grade in special education classes (Tr. 37). Plaintiff testified that medications helped his mental conditions, but that he still had suicidal thoughts, anger, and auditory hallucinations (Tr. 46-47). Plaintiff stated that the heaviest item he recently lifted was a vacuum cleaner weighing 15 to 20 pounds and that he could sit up to 30 minutes and stand for at least 20 minutes (Tr. 56). Plaintiff testified that he walked to the store, which was one-half block away (Tr. 56). Plaintiff stated that he could concentrate, but forgot things (Tr. 57).

Plaintiff's social worker, Ms. Keenan, stated that Plaintiff was disabled due to depression and bipolar disorder, and that although he could "function on minor things," he was still hearing voices

(Tr. 44, 46). Ms. Keenan testified that Plaintiff had difficulty with simple day-to-day activities, such as using a phone and reading a calendar (Tr. 64-65).

### 2.    Medical Evidence

Plaintiff only disputes the ALJ's findings with respect to his lower back condition and mental disorders. Therefore, the summary of medical evidence will focus on those conditions.

In August 2006, while incarcerated, Plaintiff presented to Darcey Maher, Ph.D., with the Michigan Department of Corrections (MDOC), with complaints of sleep problems, "worrying," depression, and auditory hallucinations (Tr. 304). Plaintiff had a flat affect and appeared extremely agitated, angry, somewhat paranoid, and depressed (Tr. 304). Plaintiff reported daily cocaine abuse for many years, had a poor work history, and could not read or write (Tr. 304). He stated that he was psychiatrically hospitalized five years previously and once attempted to overdose on pills (Tr. 304). Dr. Maher ruled out mood disorder, diagnosed cocaine dependence and antisocial personality disorder, and referred him to "OPT" (Tr. 304). Plaintiff presented to Dr. Aleksandra Wilanowski later that month (Tr. 307). Plaintiff was vague in describing his psychiatric history and reported spending all of his money and earnings on cocaine (Tr. 308, 310). Dr. Wilanowski estimated that Plaintiff had borderline intellectual functioning and noted that he appeared anxious, angry, depressed, labile, and dull (Tr. 309). Dr. Wilanowski noted that Plaintiff had osteoarthritis and diagnosed mood disorder, cocaine dependence, and antisocial personality disorder (Tr. 310). Dr. Wilanowski prescribed medication and recommended AA/NA meetings and psychotherapy (Tr. 311).

Plaintiff presented to Frank VanGoethem for therapy in September 2006 and reported that his medication was ineffective, and that he still had difficulty sleeping (Tr. 322-23). It was noted that Plaintiff was in protective status because upon arriving at the prison, he saw another prisoner with whom he had past problems (Tr. 322). Mr. VanGoethem noted several inconsistencies in Plaintiff's reported history and opined that there was a great possibility that Plaintiff was feigning symptoms for secondary gain (Tr. 323). Mr. VanGoethem noted that Plaintiff was only interested in getting more medication and stated that Plaintiff's diagnosis should be clarified (Tr. 323-24).

In October 2006, Plaintiff complained to Dr. Michaela Weller that he had insomnia and requested transfer to the general prison population (Tr. 328). Dr. Weller discontinued Plaintiff's medications because he was not clinically depressed or psychotic and prescribed a sleep aid (Tr. 329). She noted that Plaintiff was drug seeking (Tr. 329). Roughly two weeks later, Plaintiff asked Mr. VanGoethem to re-prescribe his anti-psychotic because he had difficulty sleeping; Mr. VanGoethem noted inconsistencies in Plaintiff's self reports and opined that he was drug seeking (Tr. 331). Later that month, Dr. Weller noted that Plaintiff wanted to discontinue his sleep aid and be placed on another drug, but that custody staff monitored Plaintiff and noted no sleep deprivation (Tr. 334). Dr. Weller stated that Plaintiff was embellishing his symptoms and seeking drugs (Tr. 334). That day, Plaintiff reported back pain to Mr. VanGoethem, who also stated that Plaintiff was being manipulative to get medication (Tr. 335). At the end of the month, Mr. VanGoethem stated that Plaintiff was clearly not interested in the therapeutic process (Tr. 336). During an appointment with Mr. VanGoethem in November 2006, Plaintiff reported hearing voices, but Mr. VanGoethem noted that there was no objective evidence to support the claim and that he believed Plaintiff had a profound antisocial disposition with an associated sense of entitlement (Tr. 348).

In December 2006, Plaintiff presented to Dr. Audberto Antonini with complaints including joint pain and he was prescribed medication (Tr. 356). The next day, Plaintiff was placed in an observation cell due to complaints of hearing voices telling him to kill himself (Tr. 360). On examination over the next two days, Mr. VanGoethem noted that Plaintiff did not appear depressed, and opined that he was malingering and was using "MH" symptoms to promote his agenda (Tr. 362-363). Mr. VanGoethem stated that evidence pointed most strongly to Plaintiff having characterological deficits exacerbated by his cognitive limitations, accentuating his hypervigilance and anger response (Tr. 363). Several days later, Mr. Claude Rodgers noted that Plaintiff presented with "more characterological features" and as profoundly antisocial (Tr. 369). A little more than one week later, Mr. Rodgers prepared a report very similar to the report completed by Mr. VanGoethem in September 2006 and diagnosed mood disorder, cocaine dependence, and antisocial disorder (Tr. 377-78).

Plaintiff presented to Mr. Rodgers once a month between January and April 2007 and Mr. Rodgers noted no abnormalities (Tr. 387, 390, 399, 408). In February 2007, Plaintiff was prescribed Motrin for joint aches (Tr. 391). In May 2007, Plaintiff reported to a nurse that he had lumbosacral pain that started eight or nine years previously (Tr. 420). The nurse noted that Motrin had been ordered (Tr. 420). At the end of the month, Plaintiff stated that he had back pain with bending and changing positions (Tr. 426). In June 2007, Plaintiff complained to a nurse with the MDOC that he had low back pain, which had been worse for the past two to three weeks (Tr. 430). On examination, Plaintiff had a negative straight leg raising test while sitting; a positive straight leg raising test to 70 degrees lying down; a full range of motion; pain to the touch in the right S/I joint; and the ability to heel and toe walk without difficulty (Tr. 430). The nurse diagnosed acute and chronic low back pain and managed his medications (Tr. 430). Later that month, Plaintiff reported improvement in his

back pain and although Plaintiff had a positive straight leg raising test while lying down, the nurse noted that his examination findings were obviously improved (Tr. 433). In July 2007, Plaintiff was transferred for parole (Tr. 440).

In August 2007, Sally Glowicki, a limited licensed psychologist (LLP), evaluated Plaintiff for the state DDS (Tr. 446-52). In addition to his physical complaints, Plaintiff reported sudden anger, sadness, and suicidal ideation (Tr. 446). Plaintiff reported dropping out of school in the tenth grade and being in special education classes beginning in the fifth grade (Tr. 447). He stated that he could not read or write (Tr. 447). Plaintiff reported being arrested "40 to 50 times or more since [he] was old enough to go to jail" (Tr. 448). Plaintiff also reported drinking a quart of vodka per day and that he had used cocaine, "crack," marijuana, and acid (Tr. 448). He admitted having problems with relationships and stated that his girlfriend cooked, cleaned, went grocery shopping, and managed money (Tr. 449). Plaintiff appeared to have low self esteem and displayed poor insight, judgment, and motivation (Tr. 449). His gait appeared forced and stiff (Tr. 449). Plaintiff reported visual and auditory hallucinations, thoughts of violence, panic attacks, and daily suicidal ideations (Tr. 450). Plaintiff had a blunted affect and stated that he was angry, sad, anxious, and nervous around others (Tr. 450). Ms. Glowicki noted that a 1998 IQ test of Plaintiff resulted in a score of 73, denoting borderline intellectual functioning, which she believed was consistent with Plaintiff's self report and with his performance on a mental status evaluation (Tr. 451). Ms. Glowicki diagnosed: pain disorder associated with psychological factors and a general medical condition; major depressive disorder, recurrent, moderate; alcohol and nicotine dependence; antisocial personality disorder; and borderline intellectual functioning (Tr. 452).

In September 2007, Dr. Robert Newhouse reviewed Plaintiff's records for the state DDS and assessed his mental abilities (Tr. 460-77). Dr. Newhouse provided essentially the same diagnoses

as Ms. Glowicki and opined that Plaintiff had mild limitations in activities of daily living and moderate difficulties with maintaining social functioning and in maintaining concentration, persistence, or pace (Tr. 465, 467, 470-72, 474). Dr. Newhouse opined that Plaintiff may have trouble with complex, detailed tasks, may function best in small groups, and retained the ability to perform simple tasks on a sustained basis (Tr. 462).

Later that month, Dr. Bret Bielawski examined Plaintiff for the state DDS (Tr. 456-59). Plaintiff complained of back and joint pain (Tr. 456). He claimed he could walk for one or two blocks and was noncommital on how long he could sit or stand (Tr. 456). Plaintiff had no difficulty getting onto or off of the exam table, mild difficulty heel and toe walking, and mild difficulty squatting (Tr. 457). A standing flexion test was positive on the right and he had decreased ranges of dorsolumbar spine motion (Tr. 457). Dr. Bielawski noted that Plaintiff particularly complained of pain in his right triceps, left hand, and back, "all of which [were] really unremarkable" (Tr. 459). Dr. Bielawski suggested that manipulative therapy may cause improvement and that a workup for an inflammatory process would be appropriate (Tr. 459).

On or before August 20, 2008, Plaintiff was returned to prison for a violation of parole (Tr. 523). That day, during an examination by Michael Barrett, a staff member with MDOC, Plaintiff reported hearing degrading and critical voices for as long as he could remember and feeling mildly paranoid (Tr. 520). Mr. Barrett estimated that Plaintiff had borderline intelligence (Tr. 524). Mr. Barrett diagnosed bipolar disorder, not otherwise specified, cocaine dependence, and personality disorder, not otherwise specified (Tr. 520). In October 2008, Plaintiff presented to Thomas Behrmann with the MDOC with complaints of hearing voices, uncontrolled by medication, and poor sleep and appetite (Tr. 517). Mr. Behrmann recommended an antidepressant (Tr. 517). Plaintiff was paroled in January 2009 (Tr. 526-28).

In February 2009, Plaintiff presented to Barry Ebig, a social worker at Community Mental Health (CMH), to establish a treatment plan (Tr. 491-93). Plaintiff reported feeling depressed, sad, and angry (Tr. 491). Mr. Ebig scheduled Plaintiff for regular therapy and medication management (Tr. 492). The next month, Plaintiff presented to a social worker at CMH for a psychosocial assessment (Tr. 486-90). Plaintiff complained of mood swings, getting very little sleep, and hearing voices (Tr. 486). He reported abusing all of his past girlfriends and stated that he was unable to control his anger (Tr. 486). Plaintiff stated that he had not used alcohol since his release from prison and had not used crack cocaine since late 2007 (Tr. 488). The social worker diagnosed impulse control disorder and alcohol, cannabis, and cocaine abuse in remission (Tr. 490). Plaintiff presented to Mr. Ebig on two occasions in March and April 2009 and his problems were listed as depression, anxiety, anger-impulse control, addiction/abuse, and "preparation stage of change" (Tr. 500-03). During his second appointment, Plaintiff reported improvement in his symptoms (Tr. 502-03).

Plaintiff also presented to Dr. M. H. Syed with CMH on three occasions between March and April 2009 (Tr. 504-07, 538). During the first appointment, Plaintiff stated that he was taking Seroquel (anti-psychotic) and Remeron (anti-depressant), and had symptoms including anger, sadness, suicidal feelings, poor sleep, and feelings of worthlessness (Tr. 505). On examination, Plaintiff displayed essentially no abnormalities and Dr. Syed diagnosed impulse control disorder and alcohol, cannabis, and cocaine abuse in remission (Tr. 507). Dr. Syed prescribed Seroquel and Remeron (Tr. 507). At the second appointment, Plaintiff reported increased symptoms and Dr. Syed increased his dosage of Seroquel and prescribed Vistaril (medication used to treat anxiety) (Tr. 504). During the third appointment, Plaintiff reported continuing, but improved symptoms and Dr. Syed added Abilify (medication for schizophrenia) to his treatment regimen (Tr. 538).

Plaintiff presented to Dr. Syed three times in May and June 2009 (Tr. 535-37). During the first appointment, Plaintiff reported being stressed, anxious, and tense for the past two days and reported legal and housing problems caused by drinking (Tr. 537). Plaintiff appeared depressed and withdrawn and Dr. Syed increased his dosage of Abilify and prescribed Antabuse (alcohol abuse medication) (Tr. 537). During the second appointment, Plaintiff reported that he was somewhat depressed, but had improved symptoms; Dr. Syed prescribed Celexa (anti-depressant) (Tr. 536). In July 2009, Dr. Syed completed a worksheet and opined that Plaintiff had chronic problems with anxiety, depression, and impulsivity effecting his ability to perform work (Tr. 554). Dr. Syed stated that Plaintiff had low frustration tolerance and irritability making it difficult for him to handle employment (Tr. 554).

In June 2009, Plaintiff presented to a staff member presumably in Dr. John E. Vargas' office with complaints including lower back pain (Tr. 532). It appears that the staff member diagnosed degenerative arthritis of the lumbar spine and prescribed Soma (muscle relaxant) (Tr. 532). That day, Dr. Vargas performed a lumbar spine x-ray that revealed hypertrophic osteoarthritic changes with congenital transitional vertebra at L5-S1 with pseudoarticulation resulting in chronic instability (Tr. 531, 540). Later that month, Plaintiff returned to Dr. Vargas' office with continuing complaints of back pain (Tr. 530). Although the signature and handwritten notes are largely illegible, it appears that Dr. Vargas completed a form that day indicating, in essence, that Plaintiff could never perform any physical activities (Tr. 529).

In July 2009, Dr. Vargas wrote a note stating that Plaintiff had acute chronic lumbosacral instability secondary to a congenital deformity of the fifth lumbar and first sacral segment (Tr. 542). Dr. Vargas noted that he had degenerative arthritic changes involving the lower thoracic and all five lumbar bodies (Tr. 542). Dr. Vargas opined that Plaintiff was unable to walk more than 100 paces

and should avoid lifting over 10 pounds or performing repetitive movement (Tr. 542). An unsigned and undated note from Dr. Vargas' office concerning Plaintiff's physical abilities indicates that Plaintiff had advanced degenerative arthritis of the lumbar spine with a congenital deformity, psychiatric problems, and asthma preventing him from working (Tr. 541).

### 3. Vocational Expert

During the hearing, the ALJ asked a vocational expert (VE) what work could be performed by a person with Plaintiff's age, education, and past work experience who could perform medium exertional work with further limitations including: no concentrated exposure to pulmonary irritants; only occasional postural activities; no bending from the waist to the floor; no reading or writing; minimal or no changes in work routine, tasks, or environment; and only simple routine repetitive work (Tr. 71). The VE identified several jobs (Tr. 72).

The ALJ next asked what "light" jobs could be performed with those limitations, and the VE testified that such a person could work as a food preparer, light housekeeper, and assembler, with a total of 70,000 jobs in Michigan (Tr. 72). The VE testified that his answer would not change if the person should have no more than incidental contact with the public, could work around others, but not collaboratively, and should have only occasional contact with supervisors and workers (Tr. 72-73).

### C. *Plaintiff's Claims of Error*

Plaintiff raises two arguments on appeal: (1) that the ALJ committed reversible error by finding that he had moderate deficiencies in concentration, persistence, or pace, but did not include a specific limitation corresponding to that finding in the controlling hypothetical question to the vocational expert (Pl.'s Brief at 4-6); and (2) that the ALJ did not adequately account for Plaintiff's

alleged back problems, specifically, that the ALJ mischaracterized the findings of the State Agency physician.

## III.   DISCUSSION

### A.   *Standard of Review*

In enacting the Social Security system, Congress created a two-tiered system in which the administrative agency handles claims, and the judiciary merely reviews the agency determination for exceeding statutory authority or for being arbitrary and capricious. *See Sullivan v. Zebley*, 493 U.S. 521 (1990). The administrative process itself is multifaceted in that a state agency makes an initial determination that can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council. *See Bowen v. Yuckert*, 482 U.S. 137 (1987). If relief is not found during this administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). "It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir.

2003) (an "ALJ is not required to accept a claimant's subjective complaints and may...consider the credibility of a claimant when making a determination of disability."); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, particularly since the ALJ is charged with observing the claimant's demeanor and credibility.") (quotation marks omitted); *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247, quoting, Soc. Sec. Rul. 96-7p, 1996 WL 374186, *4.

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, this Court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers*, 486 F.3d at 241; *Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted), citing, *Mullen*, 800 F.2d at 545.

The scope of this Court's review is limited to an examination of the record only. *See Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *See*

*Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court must discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal citation marks omitted); *see also Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed.Appx. 521, 526 (6th Cir. 2006).

### B. Governing Law

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994); *accord, Bartyzel v. Comm'r of Soc. Sec.*, 74 Fed. Appx. 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the Disability Insurance Benefits Program ("DIB") of Title II (42 U.S.C. §§ 401 *et seq*.) and the Supplemental Security Income Program ("SSI") of Title XVI (42 U.S.C. §§ 1381 *et seq*.). Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); *see also*, 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments, that "significantly limits...physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Carpenter v. Comm'r of Soc. Sec.*, 2008 WL 4793424 (E.D. Mich. 2008), citing, 20 C.F.R. §§ 404.1520, 416.920; *Heston*, 245 F.3d at 534.  "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates."  *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by his impairments and the fact that he is precluded from performing his past relevant work."  *Jones*, 336 F.3d at 474, cited with approval in *Cruse*, 502 F.3d at 540.  If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner.  *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006).  At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the

-15-

national economy that [claimant] could perform given [his] RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241; 20 C.F.R. §§ 416.920(a)(4)(v) and (g).

### C.    Analysis and Conclusions

As noted earlier, Plaintiff raises two arguments on appeal: (1) that the ALJ relied on an inaccurate hypothetical question that did not accurately portray Plaintiff's mental impairments; and (2) that the ALJ improperly evaluated Plaintiff's back condition. Each argument is discussed below:

### 1.    Mental Impairments

As to an allegedly disabling mental impairment, the Commissioner has promulgated a special technique to ensure that all evidence needed for the evaluation of such a claim is obtained and evaluated. This technique was designed to work in conjunction with the sequential evaluation process set out for the evaluation of physical impairments. *See* 20 C.F.R. §§ 404.1520a, 416.920a. Congress laid the foundation for making disability determinations when mental impairments are involved in 42 U.S.C. § 421(h), which provides:

> An initial determination under subsection (a), (c), (g), or (I) of this section that an individual is not under a disability, in any case where there is evidence which indicates the existence of a mental impairment, shall be made only if the Commissioner has made every reasonable effort to ensure that a qualified psychiatrist or psychologist has completed the medical portion of the case review and any applicable residual functional capacity assessment.

Section 404.1520a explains in detail the special procedure and requires the completion of "a standard document outlining the steps of this procedure." 20 C.F.R. § 404. 1520a(d). The regulation further requires the standard document to be completed and signed by a medical consultant at the initial and reconsideration levels, but provides other options at the administrative law judge hearing level. *Id.* Under this procedure, the Commissioner must first make clinical findings, as to whether the claimant has a medically determinable mental disorder specified in one of eight diagnostic categories defined

in the regulations. *See Merkel v. Comm'r of Soc. Sec.*, 2008 WL 2951276, *10 (E.D. Mich. July 29, 2008), citing, 20 C.F.R. Pt. 404. Subpt. P, App. 1, § 12.00A.

The Commissioner must then measure the severity of any mental disorder; that is, its impact on the claimant's ability to work. "This is assessed in terms of a prescribed list of functional restrictions associated with mental disorders." *Merkel*, at *10, citing, 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00C. The first area of functional restriction is "activities of daily living." This area requires the Commissioner to determine the claimant's ability to clean, shop, cook, take public transportation, maintain a residence and pay bills. *See Merkel*, at *10. Under the second functional area – "social functioning" – the Commissioner must determine whether the claimant can interact appropriately and communicate effectively and clearly with others. *Id.* The third functional area – "concentration, persistence, or pace" – refers to the claimant's ability to sustain focused attention sufficiently long enough to permit the timely completion of tasks found in work settings. *Id.* The final functional area, that of "deterioration or decompensation in work or work-like settings," refers to the claimant's ability to tolerate increased mental demands associated with competitive work. *Id.*

The degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace) is rated using a five-point scale: none, mild, moderate, marked, and extreme. *See Pauley v. Comm'r of Soc. Sec.*, 2008 WL 2943341, *9 (S.D. Ohio July 30, 2008). The degree of limitation in the fourth functional area (episodes of decompensation) is rated using a four-point scale: none, one or two, three, four or more. *Id.* "The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity." *Pauley*, at *9, citing, 20 C.F.R. § 404. 1520a(c)(4). Ratings above "none" and "mild" in the first three functional areas and "none" in the fourth functional area are considered severe. *Pauley*, at *9, citing, 20 C.F.R. § 404.1520a(d)(1). If the first two functional areas receive

-17-

ratings of "none" or "slight," the third a rating of "never" or "seldom," and the fourth a rating of "never," the Commissioner will conclude that the mental impairment is not severe, and that it cannot serve as the basis for a finding of disability. *Merkel*, at *10, citing, 20 C.F.R. §§ 404.1520a(c)(1), 404.1521.

If the functional areas indicate that the mental impairment is "severe," the Commissioner must decide whether it meets or equals a listed mental disorder. *See Merkel*, at *10, citing, 20 C.F.R. § 404.1520a(c)(2). The Commissioner will determine that the claimant is disabled if the mental impairment is a listed mental disorder and at least two of the criteria have been met. *See Merkel*, at *10, citing, 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.02, *et. seq*. If the severe mental impairment does not meet a listed mental disorder, the Commissioner must perform a residual functional capacity assessment to determine whether the claimant can perform some jobs notwithstanding his mental impairment. *See Merkel*, at *10, citing, 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3).

Plaintiff asserts that the hypothetical question did not account for his alleged deficiencies in keeping pace (Pl.'s Brief at 8-10). Plaintiff cites *Edwards v. Barnhart*, 383 F. Supp. 2d 920 (E.D. Mich. 2005) in support of his argument (Pl.'s Brief at 8-10). In *Edwards*, the ALJ found that the plaintiff had a moderate limitation in her ability to concentrate, persist, and keep pace and included in the hypothetical question a limitation on dealing with coworkers, supervisors, and the public and precluded all but simple, routine, unskilled work. *Id.* at 930. The court found that this was insufficient because the plaintiff in *Edwards* may be unable to meet quotas, stay alert, or work at a consistent pace, even at a simple, unskilled, routine job. *Id.* This case is distinguishable from *Edwards* because the ALJ accounted for all of Plaintiff's credible limitations, including those involving concentration, persistence, or pace.

The undersigned concludes that the ALJ's determinations regarding Plaintiff's mental impairments are fully supported by the substantial evidence in the administrative record.  In this matter, the State Agency examiner specifically stated that Plaintiff is "[i]ntellectually challenged and may have trouble with complex detailed tasks....  Credibility may be questioned with substance abuse and not identifying it as a problem and not being involved in any treatment for multiple problems and complaints.  May function best in small groups.  **Retains the ability to do simple tasks on a sustained basis**" (Tr. 462).  This finding is not significantly different than the hypothetical question the ALJ relied on.  The present case is thus distinguishable from *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 517 (6th Cir. 2010), where the State Agency examiner found that the plaintiff was limited to "[two-hour] segments over an eight-hour day where speed was not critical."  In *Ealy*, the Sixth Circuit found that the ALJ erred by not including these specific pace-based restrictions in the controlling hypothetical.  By contrast, the State Agency examiner's opinion in this case was not as restrictive as the examiner's opinion in *Ealy*, but rather the examiner in this case explicitly stated that Plaintiff could do "simple tasks on a sustained basis" (Tr. 462).

Moreover, decisions in this district reflect the conclusion that a moderate impairment in concentration, persistence, and pace does not necessarily preclude simple, routine, unskilled work. *See e.g., Latarte v. Comm'r of Soc. Sec.*, 2009 WL 1044836, *3 (E.D. Mich. April 20, 2009); *Street v. Comm'r of Soc. Sec.*, 390 F.Supp.2d 630, 638 (E.D. Mich. 2005), citing, *Chafin v. Comm'r of Soc. Sec.*, 2005 WL 994577, *2, 4 (E.D. Mich. April 26, 2005) (ALJ's hypothetical question addressed plaintiff's mental deficiencies sufficiently by limiting him to "simple, unskilled work."  Further, although plaintiff had "moderate" deficiencies of concentration, persistence, or pace he could nonetheless perform the work of an assembler, packager, inspector, and security monitor); *Lyons v. Comm'r of Soc. Sec.*, 351 F.Supp.2d 659, 662 (E.D. Mich. 2004) ("ALJ took into account [the]

[p]laintiff's depression ... by including limitations within the hypothetical ... limiting the possible jobs to simple, unskilled, and routine work"). The undersigned concludes that the ALJ's hypothetical question properly took into account Plaintiff's mental impairments, as found by the ALJ to be credible.

### 2.    Back Condition

The ALJ found that Plaintiff had severe physical impairments, including a congenital lumbar spine deformity (Tr. 18). After reviewing the evidence, the ALJ found that despite those impairments, Plaintiff had the residual functional capacity (RFC) to perform light work with additional physical limitations including only occasional postural activities, no bending from the waist to the floor, and no concentrated exposure to pulmonary irritants (Tr. 18, 20).

Although Plaintiff claimed debilitating limitations due to his back condition, the ALJ found that his statements were not credible to the extent they conflicted with the RFC assessment (Tr. 21). *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) ("[a]n ALJ is not required to accept a clamant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability.") The ALJ provided significant support for this finding. She found that the minimal objective evidence did not fully corroborate the level or intensity of Plaintiff's allegations of disabling back pain and noted that it was not until June 2009 that diagnostic imaging established that Plaintiff had a spine abnormality (Tr. 23-24). *See* 20 C.F.R. §§ 404.1529(a), 416.929(a); *Tyra v. Sec'y of Health and Human Servs.*, 896 F.2d 1024, 1030 (6th Cir. 1990) (demonstrating that objective medical evidence is relevant in assessing credibility). Indeed, that x-ray, performed by Dr. Vargas, is the only diagnostic study in the record of Plaintiff's lumbar spine (Tr. 540). The ALJ found that there were sparse clinical findings obtained during his incarceration prior to 2007, and following his establishment of treatment with Dr. Vargas in February

-20-

2009, without any significant abnormal findings (Tr. 23). The ALJ also found that medical records from 2007 to 2009 did not indicate that Plaintiff received any treatment for back pain during that period, which conflicted with his claims of ongoing disabling symptoms as of the alleged onset of disability date (Tr. 23-24).

In addition to the objective medical evidence, the ALJ provided other reasons supporting her finding that Plaintiff's statements were less than fully credible (Tr. 24). The ALJ noted that reports from Plaintiff's treating sources in prison questioned his veracity, suggested that his mental status reflected malingering, and indicated that his behaviors and verbalizations appeared incongruent with those of an individual with a perceptual disturbance, which he claimed to have (Tr. 24). The ALJ further found that Plaintiff's allegations of disabling pain and symptoms conflicted with the fact that his treatment for his impairments had been conservative (Tr. 24). The ALJ also noted that Plaintiff performed household chores and went to the mall, indicating that he was able to live independently, with help from his sister with grocery shopping (Tr. 24, 59-62). See 20 C.F.R. §§ 404.1529(a), 416.929(a) (Agency will consider daily activities relating to how impairments and related symptoms affect ability to work).

Plaintiff argues that the ALJ did not adequately account for limitations due to his back condition in the RFC finding (Pl.'s Br. at 10-12). In support of his argument, Plaintiff claims that the ALJ's finding that there was scant evidence prior to 2009 to suggest a disabling back condition was wrong because the ALJ made a mistake in noting that Plaintiff had normal ranges of lumbar spine motion during a September 2007 examination and did not address a finding of limited standing flexion at that appointment (Pl.'s Br. at 10-11). Plaintiff is correct that Dr. Bielawski found that Plaintiff had somewhat reduced dorsolumbar spine ranges of motion in September 2007, whereas the ALJ stated that Dr. Bielawski noted that they were normal (Tr. 22, 457). However, the ALJ's

statement that Dr. Bielawski found normal to mild findings was otherwise accurate.   On examination, Plaintiff had only mild difficulty heel and toe walking and squatting, normal ranges of motion in his extremities, normal motor strength and sensation, negative straight leg raising tests, and normal to decreased lower extremity reflexes (Tr. 457-459).  Dr. Bielawski found that although Plaintiff complained of pain in his right triceps, left hand, and back, they were all unremarkable (Tr. 459).  Plaintiff also argues that the ALJ erred in not mentioning that Dr. Bielawski stated that he had a positive standing flexion test (Pl.'s Brief at 11).  However, an ALJ need not address every piece of evidence in a decision.  *See Walker v. Sec'y of Health and Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  Furthermore, Plaintiff does not explain how this observation shows that the ALJ incorrectly found that the examination findings were normal to mild (Tr. 22).  In sum, Plaintiff has failed to demonstrate that a single misstatement regarding one report shows that the ALJ erred in finding scant evidence of a debilitating back condition.

Plaintiff also alleges that the ALJ's assessment of his limitations was flawed because a June 2009 x-ray demonstrated that he had degenerative changes in his spine, which he contends is support for the notion that he had disabling pain for years (Pl.'s Br. at 11-12).  Regardless, the ALJ accurately noted that it was not until June 2009 that diagnostic testing revealed abnormalities of his lumbar spine, which supports her finding that the minimal objective evidence did not fully corroborate the level and intensity of Plaintiff's allegations of disabling back pain.

For all of these reasons, after review of the relevant record, I conclude that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "zone of choice within which decision makers may go either way without interference from the courts," *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994), as the decision is supported by substantial evidence.

III.    **RECOMMENDATION**

Based on the foregoing, it is **RECOMMENDED** that Plaintiff's motion for remand be **DENIED**, that Defendant's motion for summary judgment be **GRANTED** and that the findings and conclusions of the Commissioner be **AFFIRMED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court.  The response shall address each issue contained within the objections specifically and in the same order raised.

s/Mark A. Randon_____
MARK A. RANDON
UNITED STATES MAGISTRATE JUDGE

Dated:  June 27, 2011

<u>*Certificate of Service*</u>

*I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, June 27, 2011, by electronic and/or ordinary mail.*

<u>*s/Melody R. Miles*</u>
*Case Manager to Magistrate Judge Mark A. Randon*
*(313) 234-5542*